UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

                  Plaintiff,

       -against-                                     16-cr-488 (LAK)

KEVIN STERLING, et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

      Appearances:

                Drew T. Johnson-Skinner
                Justina L. Geraci
                Andrew C. Adams
                *Assistant United States Attorneys*
                Joon H. Kim
                ACTING UNITED STATES ATTORNEY

                Deborah A. Colson
                Dorea H. Silverman
                *Attorneys for Defendant Kevin Sterling*

                Ying Stafford
                George R. Golzer
                *Attorneys for Defendant Alonzo Vernon*

LEWIS A. KAPLAN, *District Judge.*

      Defendants Kevin Sterling and Alonzo Vernon were charged in a four-count indictment with crimes relating to an alleged narcotics distribution conspiracy based in the Bronx and Ithaca, New York. Count One charged both defendants with conspiracy to distribute crack

cocaine and heroin, and Count Two charged both with a firearms offense in connection with the conspiracy. Counts Three and Four charged Sterling and Vernon, respectively, with possessing ammunition after having been convicted of a felony. After a two-week trial, the jury returned a guilty verdict on all counts. The Court made two rulings over the course of the proceedings that warrant further explanation given the verdict.

In the first, the Court denied the defendants' joint pretrial motion to bifurcate the trial of Counts Three and Four from that of Counts One and Two (the "Bifurcation Motion"). In the second, the Court sustained the government's objection to the defendants' proffer at trial of the testimony of a psychiatrist who previously had examined one of the government's witnesses (the "Psychiatrist Testimony"). This opinion sets out the context and bases for these two rulings.

## Facts

### The Government's Case

The government sought to prove at trial that Vernon and Sterling were leaders of a drug conspiracy that transported crack cocaine and heroin from the Bronx to Ithaca, New York, where it sold at prices higher than those prevalent in the Bronx. The two defendants allegedly enlisted others from the Bronx to do the bulk of the dealing in Ithaca, including defendant Kevin Sterling's brother, Leonard Sterling, and at least two other individuals – Christian Cosme and Roshane Henry – both of whom testified at trial pursuant to cooperation agreements.

Cosme testified that he made seven or eight trips to Ithaca to sell drugs for the defendants during the period December 2014 through May 2015. He explained that he handed the sales proceeds of each trip over to one of the defendants or to Leonard Sterling. The defendants then would pay Cosme for his services. At one such meeting, Vernon expressed his suspicion that Cosme

was pocketing some of the money and accused Cosme of owing $3,113.[1]

Cosme made his final trip to Ithaca in May 2015, after which he stopped dealing for the defendants. Soon thereafter, Cosme ran into Vernon in the Bronx. Vernon again brought up the alleged debt, warning Cosme, "homeboy, you're lucky you got a guardian angel, because if I wasn't drunk I'd fuck you up."[2] Cosme told Vernon that he would pay him the money, but never did.

On the evening of May 31, 2016, Cosme encountered Kevin Sterling on White Plains Road in the Bronx. Cosme testified that Sterling made a threatening gesture with his hand in his pocket as if he had a gun. Cosme then walked to a friend's house and gathered with a group on the front porch. Shortly after midnight, Cosme noticed a white car drive by and recognized Vernon as the driver and Sterling sitting in the front passenger-side seat.[3] After the car rounded the corner, a man whom Cosme identified as Kevin Sterling emerged at the side of the porch and asked "where's Melo?,"[4] Melo being a nickname that Cosme had used in his dealings with the defendants.[5] Although Cosme did not get a good look at the gun, he testified that Sterling fired in the direction of the group.[6] The bullet missed Cosme but struck and badly injured a female neighbor who was seated in an adjoining yard.

---

[1]      Tr. 196.

[2]      Tr. 199.

[3]      Tr. 255.

[4]      Tr. 259-60.

[5]      Tr. 260.

[6]      Tr. 260-61 (testifying that "I seen him fire, seen – I heard the fire, seen the spark.").

Cosme fled the scene of the shooting.[7]  Police arrived, interviewed witnesses, and processed the crime scene.  Officers discovered the casing of a single 9mm Luger cartridge in the yard directly in front of the porch where Cosme and his friends had been gathered.

Cosme thus proved to be a key witness for the government, as his testimony tied the two defendants to each of the counts in the indictment.  He described the workings of the narcotics conspiracy charged in Count One.  For Count Two, which charged both defendants with using a firearm in relation to the narcotics conspiracy, Cosme identified Sterling as the shooter, placed Vernon at the scene, and linked the shooting to the conspiracy.  Cosme's testimony was pivotal also to Counts Three and Four because the casing found at the scene of the shooting was said to be from a cartridge fired at Cosme and thus the ammunition the defendants were charged with possessing.

*The Bifurcation Motion*

Prior to trial, Sterling moved to suppress Cosme's out-of-court identification of him as the shooter.  The suppression hearing testimony covered much of the same ground as Cosme's eventual trial testimony summarized above.  The Court denied the motion.

Defendants then filed the Bifurcation Motion on March 21, 2017.  They argued that "admission of the defendants' prior felony convictions" to prove an element of each of Counts Three and Four "would prejudice the jury and impair its ability to fairly consider the defendants' guilt or innocence as to Counts One and Two."[8]  They contended also that bifurcation would add "little, if

---

[7]

Tr. 261.

[8]

DI 94, at 2.

any, extra time to the trial."[9]   The government opposed the motion, in part because "the evidence for the felon-in-possession counts [was] nearly entirely encompassed by the evidence for the firearms discharge count,"[10] Count Two.

The Court denied the Bifurcation Motion on March 29, 2017, stating that it "may expand on [its] ruling subsequently."[11]   This opinion provides that expansion.

*The Psychiatrist Testimony*

Another key government witness was Roshane Henry.  Like his friend Cosme, Henry testified that he had agreed to sell drugs for the defendants.  He made three trips to Ithaca, where he was arrested by an officer of the Cornell University Police Department on February 23, 2016.   At the time of his arrest, Henry had 250 glassine envelopes containing heroin in his backpack.

Henry was held on state drug charges at the Tompkins County Jail.   While incarcerated there, Henry had an altercation with corrections officers that resulted in an additional state assault charge against him.[12]   Henry's counsel in that case retained a psychiatrist, Dr. Rory P. Houghtalen, to evaluate Henry and to offer his opinions about Henry's mental health status that were relevant to his criminal responsibility on the assault charge.[13]   Dr. Houghtalen prepared a report for

---

[9]

*Id.*

[10]

DI 104, at 34.

[11]

DI 116.

[12]

Tr. 705-07.

[13]

Tr. 1096-97, 1117-18.

Henry's counsel in that case.

The government in this case informed counsel for Sterling and Vernon well in advance of trial about the fact of the evaluation and the existence of the report. In a letter of January 24, 2017, the government stated that "an individual involved in the charged offenses," identified only as "W-5,"[14] had submitted to a psychiatric evaluation "in connection with his/her arrest and prosecution by state authorities."[15] The government disclosed further that the psychiatrist had concluded, in substance, that "W-5 has a history of developmental disabilities and major mental illnesses, the latter best characterized as either schizoaffective or bipolar disorder."[16] Neither defendant requested a copy of the report or the identity of the witness or psychiatrist. Neither sought court-ordered disclosure. On the Friday before trial, the government provided the defense with its witness list, which included Henry's name, and a copy of the psychiatrist's full report.

Henry testified at trial over the course of two days. He stated on direct that he suffers from "[a]nger explosive disorder, schizophrenia," "bipolar," and "a couple other[ ]" mental disorders that he could not remember.[17] He stated that he experiences "hallucinations" that manifest as seeing and hearing people who are not there.[18] When asked, however, whether he could "distinguish

---

[14]

The government at that time declined to provide the defense with the names of its witnesses because of threatening statements Vernon allegedly had made concerning those who would testify against him. It later was revealed that the witness referred to as W-5 was Henry.

[15]

DI 1361-1, at 3.

[16]

*Id.*

[17]

Tr. 706-07.

[18]

Tr. 707.

between when something is really being said in real life versus when [he is] hallucinating it," Henry responded, "yes."[19]  Henry testified further that he had been prescribed medications for his mental health conditions, but that he had not been taking them when he was involved with the alleged conspiracy, nor was he taking them during trial.[20]  Henry explained that he often did not take his medications because they made the hallucinations and other symptoms worse and interfered with sleep.[21]

Henry's mental health was a focus on cross-examination.  Responding to questions from counsel for Sterling, Henry confirmed his diagnoses and the names of medications that he had taken in the past – depakote, lithium, and seroquel.[22]  Henry confirmed also that he sees people who "aren't there" and hears voices that "aren't real," including the voices of strangers and people who have passed away.[23]  He agreed that these voices "tell [him] to do things" and "tell [him] things that are not true," and that the symptoms get worse when he is depressed.[24]

At the close of the government's case, counsel for defendants indicated their intention to call Dr. Houghtalen as a witness.  In particular, counsel for Sterling argued that the testimony was "essential to establishing the nature and severity of Mr. Henry's mental illness and thus to assisting

---

[19]     Tr. 707.

[20]     Tr. 707-10.

[21]     Tr. 709.

[22]     Tr. 799.

[23]     Tr. 803.

[24]     Tr. 803.

the jury to assess his credibility."[25]  The government opposed the proposed expert testimony under Federal Rules of Evidence 702, 401, and 403.[26]  According to the government, the testimony would not have been helpful to the jurors and had the potential to "distract them from the real issue in this case, namely, whether the defendants hired Roshane Henry to sell drugs for them in Ithaca."[27]

In order to evaluate the merits of these arguments, the Court facilitated service of a subpoena on Dr. Houghtalen and permitted the defendants to make an offer of proof by examining him outside the presence of the jury.

Dr. Houghtalen testified to the Court alone that he had evaluated Henry in September 2015 at the Tompkins County Jail.[28]  He conducted a six-hour interview with Henry, a one-hour phone conversation with Henry's mother, and a review of "a couple binderfuls of documents" containing information on Henry's medical history.[29]  Dr. Houghtalen reviewed also video from the Tompkins County Jail of Henry's altercation with corrections officers that led to his assault charge as well as the accounts of that event that the officers had given.[30]

This review led Dr. Houghtalen to the opinion that Henry "had two major

---

[25]

DI 139, at 2.

[26]

*See* DI 140.

[27]

DI 140, at 5.

[28]

Tr. 1097.

[29]

Tr. 1097-98.

[30]

Tr. 1118-19.

problems."[31]   The first problem was "a long history of mood instability that was accompanied at times by major psychotic symptoms" that Dr. Houghtalen found to be "most consistent with schizoaffective disorder."[32]   The second consisted of "developmental intellectual deficits that were consistent with borderline intellectual function."[33]

Dr. Houghtalen described "schizoaffective disorder" as a "sort of hybrid between schizophrenia and bipolar disorder" and explained that individuals with the disorder "have both major mood episodes, like mania and depression, and also prominent psychotic features like hallucinations, delusions, [and] disorganized thinking and behavior."[34]   Dr. Houghtalen recounted the types of hallucinations that Henry had reported experiencing, including hearing voices that variously "chided him, criticized him," "offer[ed] him positive advice," or "urged him to do self-destructive things."[35]   The records that Dr. Houghtalen reviewed indicated also that Henry had told people "certain grandiose ideas," *e.g.*, that he "had great wealth" and "owned property in Miami."[36]   Dr. Houghtalen thus concluded that Henry suffered from "a serious and persistent mental illness

---

[31]        Tr. 1099.

[32]        Tr. 1099.

[33]        Tr. 1099.

[34]        Tr. 1099.

[35]        Tr. 1101.

[36]        Tr. 1101.

likely to potentially plague him for his life."[37]

Dr. Houghtalen did not comment on Henry's testimony in this trial because he had not been present to observe it. Moreover, Dr. Houghtalen said he had no opinion on Henry's credibility as a general matter nor on whether Henry lacks the ability or motivation to recount accurately events he previously had experienced.[38] Dr. Houghtalen's report, however, reviewed the evidence concerning the alleged assault. After comparing both Henry's account and the reports of the corrections officers with video footage of the incident, Dr. Houghtalen concluded that Henry's version of events was more consistent with the video than the contradictory accounts of the officers.[39]

After hearing Dr. Houghtalen's testimony and argument, the Court held the proffered testimony inadmissable and excluded it in its entirety. The Court provided some of its reasons from the bench and noted that, in the event of a conviction, it would likely expand upon them in a written opinion.[40] This opinion provides that analysis.

---

[37]

Tr. 1101.

Dr. Houghtalen provided also the indications for seroquel and depakote, the two medications that Henry was taking at the time of his evaluation. Depakote, he explained, is an anti-epileptic medication that has proven effective at treating manic episodes. Seroquel is a second-generation anti-psychotic medication used to reduce or eliminate delusions, hallucinations, and other features of psychosis. Tr. 1103.

[38]

Tr. 1113, 1116.

[39]

Tr. 1118-19.

[40]

Tr. 1125.

*Discussion*

I.        *The Bifurcation Motion*

Rule 8(a) of the Federal Rules of Criminal Procedure permits the joinder for trial of offenses that "are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."[41]   Joinder thus is "proper where the same evidence may be used to prove each count."[42]   A defendant, however, may move under Rule 14(a) to sever or bifurcate trial where joinder of counts "appears to prejudice a defendant."[43]

As the Supreme Court has noted, these rules "are designed to promote economy and efficiency and to avoid a multiplicity of trials, so long as these objectives can be achieved without substantial prejudice to the right of the defendant[ ] to a fair trial."[44]   A defendant moving under Rule 14(a) therefore bears the "heavy burden"[45] of showing that unfair prejudice from joinder "is sufficiently severe to outweigh"[46] the strain on judicial and party resources inherent in multiple or piecemeal trials.   Ultimately, "Rule 14 leaves the determination of risk of prejudice and any remedy

---

[41]
      Fed. R. Crim. P. 8(a).

[42]
      *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991).

[43]
      Fed. R. Crim. P. 14(a).

[44]
      *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (internal quotation marks and alterations omitted).

[45]
      *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994).

[46]
      *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998).

that may be necessary to the sound discretion of the district courts."[47]

Defendants argued that the risk of substantial unfair prejudice outweighed the policy concerns supporting Rule 8(a) joinder in this case. The Court disagreed. The Second Circuit's decision in *United States v. Page*[48] governed the Court's analysis.

*Page* affirmed a district court's denial of a defendant's motion to sever trial of a felon-in-possession charge from alleged narcotics offenses.[49] The defendant there similarly had argued that knowledge of a prior felony conviction would infect the jury's consideration of the defendant's guilt on the narcotics charges. The Second Circuit rejected that argument in large part because joinder was proper in the first instance and judicial economy concerns outweighed the risk of prejudice. That was so because there was "sufficient logical connection between the narcotics counts and the gun counts" because the gun was found alongside drugs in the same search, and separate trials therefore "would have required much of the same evidence."[50] The court then noted that the district court "took adequate precautions to limit the danger of unfair prejudice," including the giving of a limiting instruction to the jury. Moreover, any risk of prejudice was minimized further because "[t]he jury learned at the end of the trial through a stipulation that Page had been convicted previously of a felony, without any information relating to the underlying nature or facts

---

47

    *Zafiro*, 506 U.S. at 541.

48

    657 F.3d 126 (2d Cir. 2011).

49

    *Id.* at 128, 132.

50

    *Id.* at 130.

of the offense, and without any suggestion that Page had more than one prior conviction."[51] Accordingly, the court held that the defendant had not met his "heavy burden of showing substantial prejudice from the joinder of the narcotics counts with the gun count."[52]

Page is on all fours with this case. There is a logical connection among the four counts in the indictment, which indeed are closely interrelated. Counts Three and Four charge that the defendants possessed ammunition fired during the shooting charged in Count Two, which in turn was alleged to have been in furtherance of the drug conspiracy charged in Count One. In consequence, the evidence put forth in a separate, hypothetical trial on Counts Three and Four would have been almost entirely redundant of that involved in the trial on Counts One and Two.

The Court, of course, is well aware of the prejudice a defendant theoretically might suffer if a jury hears that he or she previously was convicted of a felony. But the existence of the prior conviction is an element of the crime charged in Counts Three and Four. The Second Circuit has "rejected the notion that the fact of a prior felony conviction is so prejudicial that it necessarily precludes a fair trial"[53] and that remains true in this case.[54]

---

[51]     *Id.*

[52]     *Id.* at 131 (internal quotation marks omitted).

[53]     *Id.* at 129-30.

[54]     At the time it decided the motion, the Court was mindful of the importance *Page* placed on the role of limiting instructions in counteracting potential prejudice. The Court therefore gave such a limiting instruction. *See* Tr. at 1346 ("I should say one more thing about the fact that each defendant has a prior felony conviction. You are not to consider those prior convictions as evidence that either defendant participated in the narcotics conspiracy in Count One or the firearms offense in Count Two, or that he's a person of bad character or that he has a propensity to engage in criminal acts. You are to consider that conviction only insofar as it satisfies an element of Count Three and Count Four.").

In resisting this, defendants leaned heavily on *United States v. Jones,*[55] a case in which the Second Circuit held that a district court should have severed or bifurcated the trial of a felon-in-possession count from three bank robbery counts. The Second Circuit in *Page* distinguished *Jones* on the basis of its "unusual facts" and "unique circumstances."[56] The most salient of these was that, after an initial trial on the bank robbery counts resulted in a mistrial, the government added the firearm count on retrial for an "improper motive" – *i.e.*, "to strengthen weaker counts that the government had been unable to prove" in the first trial.[57]

The reasons that led the *Page* court to distinguish *Jones* are present here with equal force. Here, as in *Page*, there is no indication that the government charged the felon-in-possession offenses for any reason other than "to reflect the full scope of [the defendants'] criminal conduct."[58] As the *Page* court noted, *Jones* does not stand for the proposition that "a felon-in-possession charge must *always* be severed from other charges."[59] Rather, severance and bifurcation are not necessary where there exists a "logical connection between the felon-in-possession count and the other charges, there is a similarity in the evidence necessary to provide the different charges . . . and the

---

[55]

16 F.3d 487 (2d Cir. 1994).

[56]

657 F.3d at 131, 132.

[57]

*Id.* at 132.

[58]

*Id.*

[59]

*Id.*

defendant is not substantially or unfairly prejudiced."[60]   Because those conditions are met in this case, the Court denied the Bifurcation Motion.

It is worth noting also, although it is not necessary to the result, that defendants had an option short of bifurcation that would have avoided entirely any prejudice that they feared would result from joint trial on all four counts of the indictment.   Defendants could have stipulated prior to trial to the existence of the predicate felony convictions and the interstate commerce nexus elements of the charges in Counts Three and Four, which never were in dispute, and requested that the Court instruct the jury on only the knowing possession element.[61]   The jury then would have been charged with finding that either one or both defendants knowingly possessed the ammunition and would not need to have known that the defendants had prior felony convictions.   The defendants, however, did not pursue this alternative course.

II.          *The Psychiatrist Testimony*

Rule 702 of the Federal Rules of Evidence permits the admission of expert testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

---

[60]

*Id.*

The defendants contend that the substantial overlap in evidence relevant to Counts Three and Four and Counts One and Two counsels *for* bifurcation, not against it.   According to the defendants, the Court should have instructed the jury on Counts One and Two and then, in the event of a conviction, sent the jury back to deliberate on Counts Three and Four.   It is true that the *Page* court cautioned that nothing in its opinion should be taken as a "denunciation" of bifurcation.   *Id.* at 132.   But the defendants overlook the fact that their desired approach still would have added to the duration and complexity of a knotty two-defendant, multi-count trial.   Moreover, *Page* makes clear that the Court was not *required* to conduct the trial in that manner.

[61]

Indeed, the defendants later stipulated to both of these elements of the charges in Counts Three and Four.   Tr. 1085-87.

understand the evidence or to determine a fact in issue."[62]    "The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702."[63] Moreover, like all evidence, expert testimony must be relevant[64] and may be excluded under Rule 403 if any "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[65]

   The Court here took all available steps to ensure that the defense had a full opportunity to ascertain what Dr. Houghtalen would say if called as a witness and to make a comprehensive record before the Court ruled.    After hearing the entirety of the testimony Dr. Houghtalen would have provided, the Court excluded it.  It did so for several reasons.

   First, Dr. Houghtalen's testimony was entirely cumulative of Henry's testimony. Henry testified at length on direct and cross-examination about his mental health conditions.[66]   The

---

[62]

  Fed. R. Evid. 702(a).

[63]

  *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[64]

  Fed. R. Evid. 401, 402.

[65]

  Fed. R. Evid. 403.

[66]

  The government elicited the testimony from Henry on direct and did not object when counsel for both defendants vigorously pursued the topic on cross-examination.  That tactical decision made sense in light of the fact that Henry's psychological history was admissible in so far as it related to his credibility.  *See United States v. Sasso*, 549 F.3d 341, 347-48 (2d Cir. 1995).  Of course, whether that line of questioning was proper is an entirely different question than the one at hand, *viz.* whether Dr. Houghtalen's expert testimony was admissible on the topic.

jury thus heard that Henry suffers from "bipolar" disorder, "schizophrenia,"[67] and other conditions. Henry candidly described his hallucinations. He further admitted that, while he previously had been prescribed medication, he was not taking any during his involvement with the defendants or at trial.[68] He testified also that he could tell the difference between reality and hallucinations. Dr. Houghtalen's testimony did not conflict with or meaningfully elaborate on Henry's. Information concerning Henry's mental health conditions and their symptoms "was all before the jury and the testimony of the psychiatrist could only have . . . caus[ed] further irrelevant distraction."[69]

Second, the testimony would have proved unhelpful to the jury in any event. Defendants argued that Dr. Houghtalen's testimony was "essential to establishing the nature and severity of Mr. Henry's mental illness and thus to assisting the jury to assess his credibility."[70] Dr. Houghtalen's testimony, however, would not have assisted the jury in that task. Dr. Houghtalen met with Henry on a single occasion over a year prior to trial in order to develop opinions relevant to Henry's culpability with respect to an alleged state assault charge. That context matters not because it undermines Dr. Houghtalen's diagnosis, which the Court has no reason to doubt, but because it

---

[67] Henry's understanding of his diagnoses differed from Dr. Houghtalen's opinion in immaterial ways. Whereas Henry reported that he suffers from bipolar disorder and schizophrenia, Dr. Houghtalen diagnosed him with schizoaffective disorder, which he characterized as a "sort of hybrid" of the two. This discrepancy does not impact the Court's analysis.

[68] For this reason, Dr. Houghtalen's proposed testimony regarding the indications of the various medicines, in addition to being unhelpful, would have been entirely irrelevant.

[69] *United States v. Pacelli*, 521 F.2d 135, 141 (2d Cir. 1975).

[70] DI 139, at 2.

explains why he had very little to say that would have been relevant or helpful here.[71]   Indeed, Dr.

Houghtalen's proffer included no testimony beyond the fact of his diagnosis and a description of

Henry's symptoms.   He would not have opined on whether Henry was able to recognize which

voices he hears are real or not.   He had no opinion to offer on whether Henry was experiencing

hallucinations at the time of his asserted involvement with the defendants.   He would not have

opined on the accuracy of Henry's trial testimony, even if that otherwise might have been

appropriate, because Dr. Houghtalen did not observe Henry during trial and was unaware of the

substance of Henry's testimony.   In fact, Dr. Houghtalen formed no opinion on the key issue –

Henry's credibility – on which defendants urged that the doctor's testimony was "essential."[72]

Moreover, Dr. Houghtalen's testimony made clear that, if asked, he would not opine

that Henry was incapable of reliably narrating past events.[73]   Moreover, as part of his work for Henry

for the Tompkins Country assault case, Dr. Houghtalen had credited Henry's retelling of the events

that led to Henry's alleged assault of corrections officers over the corrections officers' accounts.[74]

---

[71]

> *Cf. United States v. Sessa*, 806 F. Supp. 1063, 1065, 1070 (E.D.N.Y. 1992) (excluding as not helpful under Rule 702 a psychologist's testimony concerning his prior evaluation of a witness for a very different purpose – in that case, an evaluation to determine "the suitability of [the witness] for placement in the Witness Security Program.").

[72]

> Moreover, the hallucinations of Henry's that Dr. Houghtalen described – that Henry heard voices, "one that chided him, criticized him,' one "offering positive advice" and "others that urged him to do self-destructive things" – are a far cry from imagining entirely the defendants' involvement in the drug conspiracy.   Tr. 1100-01.   To be sure, it is the prerogative of a juror in evaluating the testimony of a witness who hears imagined voices to consider whether the witness may have imagined parts of his or her trial testimony.   But Dr. Houghtalen's testimony would not have assisted any juror in making that determination in any meaningful way.

[73]

> Tr. 1116.

[74]

> *See* Tr. 1118-19.

In other words, Dr. Houghtalen himself concluded that Henry had been a credible witness in the past despite his mental disorders.

Third, admission of the proffered testimony would have risked intrusion on the jury's core function of evaluating witness credibility.[75] Courts have recognized the powerful impact psychiatric testimony may have on juries and the risk that such testimony "may cause juries to surrender their own common sense" when evaluating a witness' credibility.[76] In this case, the jurors' common sense was sufficient to evaluate Henry's testimony. The proffered expert testimony only would have sown confusion and distracted the jurors from that evaluation.

The Court does not express a view as to whether testimony from a mental health expert in some cases could be helpful to the jury in evaluating the credibility of a witness' testimony in light of his or her mental illness. A psychiatrist, for example, might explore whether and how a witness' particular condition would impact his or her ability to perceive, remember, or accurately report on a certain event or piece of evidence. But "[w]hether or not psychiatric testimony is admissible to impeach the credibility of a witness is within the discretion of the trial judge."[77] The

---

[75]

See, e.g., Chesapeake & O. Ry. Co. v. Martin, 283 U.S. 209, 216 (1931) ("We recognize the general rule . . . that the question of credibility of witnesses is one for the jury alone."); United States v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973) ("As we have seen, competency is for the judge, not the jury. Credibility, however is for the jury – the jury is the lie detector of the courtroom.").

[76]

Barnard, 490 F.2d at 912-13.

[77]

Pacelli, 521 F.2d at 140 (citing Hamling v. United States, 418 U.S. 87, 108 (1974)); accord United States v. Moten, 564 F.2d 620, 629 (2d Cir. 1977).

The expert in Pacelli would have testified that a government witness was "incapable of telling the truth." 521 F.2d at 140. The Second Circuit since has suggested that that type of testimony is inadmissable per se. In United States v. Scop, the court excluded expert testimony on the credibility of another witness because "credibility of witnesses is

factors relevant to the exercise of that discretion are the same that guide any analysis of expert testimony under Rules 702 and 403 – that is, a court must consider among other things whether the admission of psychiatric testimony would be helpful to the jury, or whether it more likely would to lead to confusion or a trial within a trial on tangential issues.[78] The Court assumes, moreover, that the admissibility of a psychiatrist's testimony on the mental health of a witness might present a difficult question in some cases. In light of the foregoing discussion, however, the Court concluded that this was not such a case. For the foregoing reasons, the Court excluded Dr. Houghtalen's testimony.

---

exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." 846 F.2d 135, 142 (2d Cir. 1988). The court went on to state that "even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible." *Id.* At least one court has observed that this statement in *Scop* sweeps too broadly, and that "it seems doubtful that the Court of Appeals intended to apply such a sweeping rule of preclusion, which was not necessary to its decision in *Scop*, to its fullest possible extent." *Sessa*, 806 F. Supp. at 1067.

Whatever tension exists between *Scop* and *Pacelli* has no bearing on this case, however, because Dr. Houghtalen did not opine on whether or not he found Henry's trial testimony credible. In any event, it does not matter whether *Scop* compelled exclusion, or whether *Pacelli* left the question of admissibility to the Court's discretion. The Court would have reached the same conclusion either way.

[78] *See, e.g.*, *Pacelli* 521 F.2d at 140 (considering these factors).

*Conclusion*

This opinion provides the context and bases for the Court's prior rulings on the defendants' Bifurcation Motion [DI 93] and the admissibility of the Psychiatrist Testimony. For the reasons provided here and those previously stated on the record, the Court denied the Bifurcation Motion and excluded the Psychiatrist Testimony in its entirety.

SO ORDERED.

Dated:     May 24, 2017

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)